The FAIR, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 12628.

United States Court of Appeals
Seventh Circuit.

Dec. 8, 1959.

Rehearing Denied Jan. 7, 1960.

George E. Hale, David L. Dickson, Charles J. Barnhill, K. F. Montgomery, Chicago, Ill., for petitioner, Wilson & McIlvaine, Chicago, Ill., of counsel.

Alan B. Hobbes, Asst. Gen. Counsel, Daniel J. McCauley, Jr., Gen. Counsel, Charles F. Simon, Atty., Federal Trade Commission, Washington, D. C., for Federal Trade Commission.

Before DUFFY, KNOCH and CASTLE, Circuit Judges.

KNOCH, Circuit Judge.

This proceeding was instituted June 17, 1957, in a complaint filed by the Federal Trade Commission, charging violations of the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq., the Fur Products Labeling Act, 15 U.S.C.A. § 69 et seq., and Rules and Regulations promulgated thereunder, in labeling, invoicing and advertising fur garments sold in The Fair stores.

Both the counsel supporting the complaint and The Fair appealed from the Hearing Examiner's provisional order to cease and desist. The Commission, after considering the cross-appeals, vacated and set aside the initial decision. Findings, conclusions, and order of the Commission were substituted in toto for the Hearing Examiner's decision. The Fair

seeks to review and set aside the Commission's cease and desist order.

The issues may be summed up as: (1) whether guaranties furnished by suppliers were "received in good faith" by The Fair, so as to afford a defense to charges of misbranding and deceptive advertising; (2) whether the Commission's findings were supported by substantial evidence; and (3) whether the Commission's order was unduly broad.

In February 1957, The Fair leased its fur departments to an independent contractor who operates them as an independent entity. However, a large measure of control is retained by The Fair in that, for example, all business and advertising is done in the name of The Fair, which approves and actually hires the lessee's employees, makes independent adjustments of customer complaints and accounts, and retains the right to approve advertising. The customers have no way of knowing that they are dealing with an independent contractor. We agree with the Commission in its conclusion that action on the complaint was not barred on the ground that The Fair had gone out of the fur business.

The Fur Act describes a fur product as misbranded if there is not affixed to it a plainly legible label showing the name or names of the fur producing animal; the fact (if that is the case) that the product contains used, bleached, dyed or otherwise artificially colored fur, or is composed in whole or substantial part of paws, tails, bellies, or waste fur; the registered identification of those who manufacture the product for introduction, introduce it, sell it, advertise or offer it for sale, transport or distribute it into commerce; and country of origin of imported furs.

The Rules and the Regulations of the Commission provide for size of type or hand printing, prohibit handwriting, require placement of the above required information on one side of the label only, (with non-deceptive, non-required information on the reverse side where lot or style number and size may be placed) and separate information respecting each different animal fur where more than one is used in the same garment.

The violations in branding or labeling charged here included: a few handwritten labels containing (in addition to the required data) non-required words "fur name" on the same side; one garment with no fur identification; a handwritten label which omitted the information that the fur was dyed and which contained the non-required words "romance flank muskrat"; more than thirty labels containing non-required words, *e. g.* "romance" and "fur name"; several labels omitting the information that the fur was dyed; about ten labels omitting name or registered number of marketer; several labels omitting the name of mink trimming used on a garment of another fur; more than a dozen labels having the words "Southwest Africa" abbreviated as "S. W. Africa"; and several labels on garments of Persian Lamb in which the word "Lamb" was omitted.

The Fair contended that any such misbranding was immaterial in character and quantity, but its primary defense was that it relied on a guarantee, allegedly received in good faith, from the manufacturer or supplier of each garment (pursuant to Section 10(a) of the Fur Act) to the effect that the fur products were not misbranded.

Section 10(a) provides:

"No person shall be guilty * * if he establishes a guaranty received in good faith signed by and containing the name and address of the person residing in the United States by whom the fur product or fur guaranteed was manufactured or from whom it was received, that said fur product is not misbranded or that said fur product or fur is not falsely advertised or invoiced under the provisions of this Act. Such guaranty shall be either (1) a separate guaranty specifically designating the fur product or fur guaranteed, in which case it may be on the invoice or other paper relating to such fur product or

fur; or (2) a continuing guaranty filed with the Commission applicable to any fur product or fur handled by a guarantor, in such form as the Commission by rules and regulations may prescribe."

The Hearing Examiner found that all these labels were those of the manufacturer or other suppliers, that the majority of the defects were not obvious and could easily have been overlooked, that their discovery required careful scrutiny by one skilled in furs and well versed in the Fur Act and the Commission's Regulations; that the one error of a missing label which could have been easily detected was merely overlooked and had been corrected. Accordingly the Hearing Examiner held that The Fair was entitled to rely on the guarantee and that it could not be held guilty of misbranding.

■ In the Commission's view, however, The Fair was legally obligated to examine and to correct the labels; and The Fair's fur buyer was possessed of the requisite skill to discern the deficiencies, which the Commission thought were all readily apparent on the face of the labels. Thus, the Commission found The Fair's contention of reliance "in good faith" on suppliers' guaranties unconvincing, on the theory that the defects should have been discovered by exercise of ordinary diligence. The Commission relies on its Rule 34(a) which reads:

"If a person subject to * * * the Act with respect to a fur product finds or has reasonable cause to believe the label affixed thereto is incorrect or does not contain all the information required by the Act and the rules and regulations, he shall correct such label or replace same with a substitute containing the required information."

However, as we read Rule 34(a), it merely permits the retailer to correct errors. It does not, as the Commission contends, impose a legal obligation on The Fair to examine the labeling of fur products for errors in compliance and to correct all such errors under the burden of forfeiture of its rights under Section 10(a), supra for failure to discover any such errors as may exist. The Hearing Officer found that The Fair's good faith had not been attacked. He analyzed Section 10(a) as expressing Congressional intention (1) to stop misbranding and faulty labeling at the source; and (2) that enforcement was to be exercised where labeling is initiated, by the manufacturer or supplier who is in the best position to know the character of the furs from which the products are made. We agree. The Commission inferred a lack of good faith solely on the ground that The Fair was obligated to examine the labels, regardless of guarantee, and that The Fair was, therefore, responsible for all errors discernible, by exercise of ordinary diligence, to one possessed of the requisite skill and knowledge of the Act and regulations. As indicated, it is our conclusion that no such duty has been imposed.

The same reasoning applies to the three or four mislabeling defects carried over into advertising copy. Typical of those was omission of the word "lamb" in describing "Persian Paw" and "Black Dyed Broadtailed" jackets.

The Commission also found that The Fair engaged in "fictitious pricing" in advertising fur products to be sold at prices reduced from "usual" prices, where the "usual" prices were not prices at which such merchandise was "usually" sold by The Fair. Some, but not all, of these garments had in fact been "marked down". With respect to the others, The Fair contends that "usual" means prices charged by The Fair or by other merchants for similar goods, rather than the same item reduced in price, citing the "Guide for Retail Advertising and Selling", Fifth Edition, 1956, Association of Better Business Bureaus, Inc. That publication warns against use of the word "usually" to mean mark-down in one's own store because the term is to be used to express a comparative price on a special purchase.

As the Commission argues, however, the controlling test is the understanding of the consumer, who might very well believe that use of the word "usual" price in this regard meant that the item had been "marked down." Progress Tailoring Co. v. F. T. C., 7 Cir., 1946, 153 F.2d 103, 105; Mandel Brothers, Inc. v. F. T. C., 7 Cir., 1958, 254 F.2d 18, 21.

The Commission's finding of failure to maintain full and adequate records rested on the above described finding of fictitious pricing. The Commission concluded that records which did not support the prices advertised must be inadequate. This does not necessarily follow. The Fair never asserted that the "usual" prices listed in the advertisements were in all cases its own prices. Besides, The Fair's assistant comptroller testified that many of the records were destroyed in 1957 when the lease to the independent contractor went into effect.

However, the testimony of The Fair's comparison shopper, as to her duties and the type of records she made, did indicate that she was not a fur expert, that her checking duties were performed in no regularly scheduled manner, and that her notations of her investigation of other merchants' prices were not such as to constitute adequate records, even had they all been preserved for submission as evidence.

It is, therefore, apparent that The Fair had not maintained records to support its own contention of what were "usual" prices by its own definition. The Hearing Examiner had based his finding that adequate records were maintained solely on the fact that complete records existed of prices paid for garments by The Fair, and prices at which The Fair offered these same garments at retail, including mark-downs and reductions of those garments.

There was one instance of a misleading illustration in advertising. The garments advertised were split-skin mink jackets. The illustration accurately showed the style of the actual garments offered for sale, but, in fact, pictured a let-out mink jacket—admittedly a higher quality fur garment. The Hearing Examiner found that only a fur expert could detect the difference from studying the illustration and that the purchasing public was unlikely to be deceived. He applied the *de minimus* rule and concluded that no violation had occurred. The Commission held otherwise. This was a clear and actual violation and thus, in our opinion, it constituted ground for issuance of a cease and desist order prospective in effect to protect the public.

The evidence of false and deceptive invoicing of fur products consisted of sales slips issued by The Fair to its retail customers. The Fair does not contend that these sales slips conformed to the requirements of the Fur Act, or the Rules augmenting it, with respect to invoicing. The Hearing Examiner initially decided that sales slips did not constitute "invoices" within the meaning of the Act. The Commission reversed that decision.

The issue has been resolved for us, in the Commission's favor, by the U. S. Supreme Court in F.T.C. v. Mandel Brothers, Inc., 1959, 359 U.S. 385, 390, 79 S.Ct 818, 3 L.Ed.2d 893.

We, therefore, direct that the Commission's Cease and Desist Order be vacated and set aside only insofar as it relates to the subject of misbranding. In all other respects, the petition to review and set aside the Order is denied and enforcement is ordered.

Enforcement ordered in part and in part denied.